8 So.2d 196

**CRANE CO. v. DAVIES.**

**6 Div. 978.**

Supreme Court of Alabama.

March 26, 1942.

Rehearing Denied April 16, 1942.

J. P. Mudd, of Birmingham, opposed.

Sadler & Sadler, of Birmingham, for petitioner.

BROWN, Justice.

This is an action on the case by a tenant against a manufacturer, alleged to be "engaged in the business of manufacturing, assembling, and selling to dealers and merchants plumbing and heating equipment and supplies, including boilers, to be resold or distributed by said dealers and merchants to the public, for the use by said public in and about the ordinary purposes for which said plumbing, heating, and furnace equipment and supplies, including boilers are customarily used."

The case was tried and submitted to the jury on count 1 of the complaint, which, in short, avers that plaintiff's lessor the owner of the house in which plaintiff held a leasehold interest, purchased from Charles A. Mandy, doing business as Mandy Plumbing Company, "a boiler, heating and furnace equipment, assembled or manufactured by the defendant," and engaged said Mandy to install "said boiler, heating and furnace equipment in said house, and the said Charles A. Mandy, or his servants, agents, or employees, did so install said boiler, heating and furnace equipment in said house."

"That said boiler, furnace and heating equipment and supplies, *manufactured and assembled by the defendant,* were not reasonably safe for use by the public, including the plaintiff, when used in the usual and customary manner, but, on the contrary, said boiler, furnace and heating equipment were imminently or inherently dangerous and likely to explode or burst and cause injury and damage to the public, including the plaintiff, when used and applied in the usual and customary manner, and for the purposes for which said boiler, furnace, and heating equipment were manufactured or assembled by the defendant. * * *

"That such danger and likelihood of exploding and causing injury or damage to the public was known at said time to the

defendant, or by the exercise of reasonable care should have been known to the defendant, and the likelihood of exploding and causing damage was not known to the plaintiff, and was not revealed to the plaintiff or to the said Herbert A. Davies, Sr., [the lessor] by the defendant." [Italics supplied.]

That said boiler, furnace and heating equipment manufactured or assembled by the defendant *"as aforesaid"* while being used or operated "in the usual and customary manner and for the purposes for which said boiler, heating and furnace equipment had been *manufactured or assembled and distributed by the defendant,* said boiler or heating and furnace equipment exploded or bursted, and as a proximate consequence thereof plaintiff was injured and damaged." [Italics supplied.]

The defendant pleaded the general issue, in short by consent, with leave, etc. There was a judgment for plaintiff and the defendant appealed to the Court of Appeals, where the judgment was affirmed. 8 So. 2d 189. The case is here by certiorari.

The evidence, as found and stated by the Court of Appeals, was:

"Before making certain contemplated alterations to the house which was to be remodeled, Mr. Davies, Sr., consulted a representative of Crane Company, who had called upon him, as to the size and character of heating plant suitable for the building. This representative assured him that defendant had just the suitable equipment for establishing in the house a proper heating system. After taking the contemplated plans for the remodeled house for the purpose of laying out designs for a complete heating system therein, the defendant prepared blue prints and plans for such plant, showing the piping layout, sizes, connection, etc., of same, the boiler to be used and other instructions as to the installation of the system and delivered them to Mr. Davies, Sr. An estimate of the cost of the material was also given him. It was understood that the boiler and radiators should be billed through a friendly plumber, the company suggesting a Mr. Mandy as such plumber. The pipes and fittings were purchased from defendant through Virginia Bridge Company, of which Mr. Davies, Sr., was branch manager.

"The house was remodeled and the heating system installed therein substantially according to plan, Mr. Davies, Sr., doing the carpenter work and installing the pipes and Mr. Mandy installing the boiler, valves and radiators. The heating plant was known as a closed hot water system, circulation therein being controlled by a 'booster pump' actuated automatically by room temperature.

"On December 14th the work was completed. The weather became cold, so that night, after checking the gauges and observing that the system was apparently in satisfactory working order and ascertaining that Mandy's men had already had a fire burning in the furnace Mr. Davies, Sr., replenished the fire with a small amount of coke (about 20% of furnace capacity) to prevent freezing of the system during the night. Later that night the boiler exploded, resulting in considerable damage to the house and its furnishings. The house was enveloped in steam, heard to escape at the time of the explosion. The break was in the rear of the boiler where the water line from the house reentered it. * * *

"The testimony of Mr. Davies, Sr., and that of his expert witness, Boisclair, was that the system, with the boiler, as designed by the defendant, was inherently or intrinsically dangerous in that there was no reverse acting aquastat or other safety device to maintain proper circulation of the water through the system. The tendency of this evidence further established that the booster pump being actuated only by room temperature, the water could not circulate by reason of thermal differences; that the heat generated was concentrated upon the water in the boiler which gradually reduced its level below the crown sheet, thus creating in the boiler steam at high pressure which held the water from the boiler until the room temperature should become low enough to actuate the booster pump. Then when this lower temperature was reached the booster pump automatically started forcing cold water into the overheated boiler, whereupon it flashed into steam, the ratio of expansion being about 1700 to 1. As a result the casting of the boiler cracked, hence the explosion.

"Evidence for the defendant sought to establish that the cause of the explosion was in doubt, although no contrary theory was advanced except that there was some minor deviation from the piping plan in the piping installation; that this boiler was similar to others now in satisfactory use, no other such explosions having been recorded; that the plans for the system

had been furnished gratuitously, the articles making up the system having been manufactured free of defect and marketed in sections only; further that Mr. Davies, Sr., sought to operate the system before Mr. Mandy had completed his inspection.

"According to Mr. Davies, Sr., Mandy stated the morning following the explosion that he had, the previous afternoon, checked the operation of the system and found it functioning properly, that 'he had completed his inspection and found the system to be in satisfactory operating condition.'"

The contention of the petitioner, appellant in the Court of Appeals, is that there was a failure of proof of the essential elements of the cause of action as stated in the complaint, and that it was due the affirmative charge; also that the trial court erred in refusing certain special written instructions.

The trial court gave the following special charges requested by the defendant in writing:

"If you believe the evidence there was no contract between Mr. Davies and Crane Co."

"If you believe the evidence, Mr. Mandy was not an agent, servant or employee of Crane Co."

"If you believe the evidence Crane Co. did not sell the boiler or any of the boiler attachments to Mr. Davies."

"The burden of proof is not on Crane Co. to show what exploded on the occasion complained of or to show that the boiler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . did not explode; and if you believe from the evidence that the boiler did explode, the burden is not on Crane Co. to show what caused it to explode."

And refused the following special charges, so requested:

"If you are reasonably satisfied from the evidence that Mr. Davies put a fire under the boiler before Mr. Mandy had completed his tests and before Mr. Mandy had turned the job over to Mr. Davies, you must find for the defendant."

"If you are reasonably satisfied from the evidence that the boiler mentioned in the evidence was not put on the market as an assembled unit but in sections, and that there were no defects in any of the material purchased for the Davies job, your verdict must be for the defendant."

"Unless you are reasonably satisfied from the evidence that Crane Co. put on the market a completed unit which was imminently dangerous when used as the manufacturers intended it should be used, and knew that it was imminently dangerous or by reasonable care should have so known, and that Mr. Davies was not advised of such condition by literature or otherwise, you can not find for the plaintiff."

"If you are reasonably satisfied from the evidence that Mr. Davies used the boiler before the installation and test had been completed, and before it was delivered to him for use, and that the injury resulted proximately therefrom, you must find for the defendant."

The gravemen of the count, framed under the "Manufacturers Liability Doctrine," is: "That said boiler, furnace and heating equipment and supplies, *manufactured and assembled* by the defendant, were not reasonably safe for use by the public, including the plaintiff, when used in the usual and customary manner, but, on the contrary, said boiler, furnace, and heating equipment were imminently or inherently dangerous and likely to explode or burst and cause injury and damage to the public, including the plaintiff, when used and applied in the usual and customary manner, and for the purposes for which said boiler, furnace, and heating equipment were manufactured or assembled by the defendant"; that defendant had knowledge of such danger and was negligent in not warning the purchaser or was negligent in not discovering such danger. [Italics supplied.]

"The Manufacturers Liability Doctrine," heretofore has been limited in its application to "finished products" manufactured or assembled and sold to the immediate user or put on the market through dealers to be so sold to be used by the purchaser for the purposes for which it was manufactured or assembled, without the necessity to ascertain whether or not its use is attended with imminent danger. The foundation for liability is knowledge of the danger and negligence in failing to give appropriate warning, or negligence in failing to discover and appreciate the danger, and the probable consequences that injury will proximately result from the use of such product for the purposes for which it was intended. Miles v. Chrysler Corporation, 238 Ala. 359, 191 So. 245; MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, 1053, L.R.A.1916F,

696, Ann.Cas.1916C, 440; Sterchi Bros. Stores, Inc., v. Castleberry, 236 Ala. 349, 182 So. 474; Jefferson Standard Life Ins. Co. v. Watson, ante, p. 181, 5 So.2d 639; Altorfer Bros. v. Green, 236 Ala. 427, 183 So. 415.

The Court of Appeals, in the opinion brought under review, has extended the doctrine to the manufacturers of the component parts purchased and assembled by the purchaser, his servant or contractor, a process with which the defendant had nothing to do, injecting into the situation the duty of performing the work in a workmanlike manner, requiring inspection and determination as to whether the job of assembling had been finished; and whether or not the heating system thus produced was suitable for the uses and purposes of its creation.

We are not called on in this case under pleading to say whether or not this doctrine should be so extended and applied. We are of opinion that the evidence did not sustain the material averments of the complaint, and that defendant was due the affirmative charge.

The judgment of the Court of Appeals is, therefore, reversed and the cause is remanded.

Writ granted; reversed and remanded.

THOMAS, BOULDIN, FOSTER, and LIVINGSTON, JJ., concur.

GARDNER, C. J., dissents.

KNIGHT, J., not sitting.